FILED

DEC 1 9 2005

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

NOT FOR CITATION

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| ERIC GREENE, | ) | No. C 03-1361 JF (PR) |
| Petitioner, | ) | ORDER DENYING PETITION |
| | ) | FOR WRIT OF HABEAS |
| vs. | ) | CORPUS |
| D. L. RUNNELS, Warden, | ) | |
| Respondent. | ) | |

**INTRODUCTION**

Petitioner seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his conviction for murder, attempted murder, robbery and attempted robbery. Petitioner raises the following claims for habeas relief: (1) by overruling Petitioner's objections to the prosecutor's peremptory challenges of African-American jurors, the trial court violated Petitioner's Sixth and Fourteenth Amendment rights to trial by jury; (2) the trial court's admission of the preliminary hearing testimony of a crucial witness violated Petitioner's Sixth and Fourteenth Amendment rights to confrontation and cross-examination; (3) the trial court's refusal to grant a mistrial after the prosecution elicited expert witness testimony regarding Petitioner's police department fingerprint records violated Petitioner's Fifth and Fourteenth Amendment rights to due process; (4) the trial court's instructions to the jury on the felony murder rule violated Petitioner's Fifth,

1   Sixth, and Fourteenth Amendment rights to due process and to have the jury determine every

2   factual issue in the case; and (5) the trial court's use of CALJIC No. 17.41.1 in instructing the

3   jury deprived Petitioner of his Sixth and Fourteenth Amendment rights to trial by an impartial

4   jury. This Court ordered Respondent to show cause why the petition should not be granted.

5   Respondent filed an answer addressing the merits of the petition, and Petitioner filed a traverse.

6   After reviewing the papers and the relevant portions of the record, the Court concludes that

7   Petitioner's claims are without merit and will deny the petition.

8

## FACTUAL BACKGROUND

9

The California Court of Appeal summarized the relevant facts as follows:

10

11       In January 1996, Enrique Rodriguez was almost 16 years old and lived in apartment
302 at 1900 26th Avenue in Oakland with his parents, a brother and a friend named

12       Gilberto Gil. On January 20, 1996, Rodriguez had accompanied Gil to the restaurant
where Gil worked, Gil had cashed a check and the two had visited a friend. When

13       they returned to the apartment building, after dark, it was raining heavily. Gil opened
the front gate with his key and they climbed the stairs to a second door, which Gil

14       also opened with a key. A black male about 16 years old, whom Rodriguez had seen
around the building a few times, left as Rodriguez and Gil entered. Rodriguez

15       subsequently identified the young man as Nakeyveyon Jones.

16

17       As Rodriquez followed Gil up the next staircase, a group of about four young
African-American men appeared from behind the stairs.[1] They were all wearing dark

18       colored jackets and pants and had their heads and faces partially covered with white
cloth (except for one that was green or yellow), so that Rodriguez could see only their

19       eyes, noses and cheeks. They appeared to be 16 to 20 years old, skinny and about 5'6"
to 5'8" tall, although some could have been taller or shorter.[2]

20

21       One of the group pointed a short barreled rifle at Rodriguez and said, "Break
yourselves, mother fuckers." Rodriguez noticed the person he had seen leaving the

22       building come back inside and stand by the door, "like he was scared or something."
Gil ran up the stairs and the man with the rifle chased him. The others grabbed

23       Rodriguez, made him walk to the landing, searched him and took his wallet, which
contained less than $40. They then told him to run, and Rodriguez ran to his

24

_____

25

26       [1] Rodriguez had told the police there could have been five or six in the group but testified
that four was his "best estimate."

27

28       [2] Rodriguez had told the police at the time of the incident that the men in the group were
between 5'6" and 5'11" and that the one with the gun was about 5'11."

1
2
3
4
5

apartment. As he reached the third floor, he heard three or four gunshots. He turned the corner to go to his apartment and saw the man with the rifle shooting Gil, who was lying on his stomach in front of the apartment door. Rodriguez saw the man fire four shots in rapid succession. The man turned, shot Rodriguez twice, in the left hand and right arm, then ran down the stairs. Rodriguez ran to the fire escape, watched the front door of the building until the police arrived and did not see anyone leave the building. About two minutes after a police officer arrived, the paramedics came and took Rodriguez to the hospital for treatment.

6
7
8
9
10

Rodriguez spoke to the police shortly after he arrived at the hospital, then again at about 3 a.m., and at his house about 10 days later. He initially told the police officer he did not recognize any of the men but that the one he had seen leaving the building might have lived in the building. At trial, Rodriguez testified that he knew co-defendant [Randy] Mouton from living in the building and that Mouton had been "a lot" shorter in January 1996. Rodriguez did not recognize Greene as living in the building.

11
12
13
14
15

Oakland Police Sergeant Thomas Swisher, who had retired by the time of trial, testified that he spoke with Rodriguez at about 2:30 a.m. on January 21. Rodriguez was in a lot of pain from his gunshot wounds. He told Swisher that he had looked out the fire escape door and had not seen the shooter leave the building, and that the shooter was about 5'8" tall. On January 31, Swisher showed Rodriguez photographs of Mouton, Greene and Jones. Rodriguez did not recognize Greene, said Mouton lived on the first floor of the building, and identified Jones as the person he saw leaving the building as he and Gil entered.

16
17
18
19
20
21
22
23
24
25

Transito Chavez, who lived in unit 110 on the first floor of the building, was outside smoking a cigarette about fifteen minutes before the shooting. It was not raining. Chavez was holding the door of the building open about a foot and he could see the whole lobby. He observed four young men, about 5'6" to 5'7" and 130 to 140 pounds, enter the lobby, then walk toward the stairs and go up. The group included Mouton, whom Chavez had seen around the building a number of times, and three others whom he had seen "once or twice" talking with Mouton. They were dressed in dark clothing. Chavez returned to his apartment and about fifteen minutes later heard seven shots, with a gap of one to three seconds between some of the shots. He then heard people running down from the second floor, followed by the sound of someone laughing and people gathering outside the apartment. About a week after the shooting, Chavez was interviewed by the police and identified a photograph of Mouton. He testified at trial that a photograph of Mouton showed one of the four people he had seen in the lobby and a photograph of Nakeyveyon Jones "could have been" one of the people. He did not recognize a photograph of Greene as one of the people.

26
27
28

Oakland Police Officer Cynthia Espinoza arrived at 1900 26th Avenue at about 11:21 p.m. on January 20, 1996. Two other officers were already at the front gate. They banged on the gate until it was opened by Mouton. There were five or ten people in the lobby, who directed the police to the third floor. Espinoza found Gil lying on his

stomach, unconscious, a little bit past unit 302. Rodriguez was standing, holding his arm where he had been shot. Espinoza took a brief statement from Rodriguez, who was then taken to the hospital by the paramedics.

Espinoza and other officers searched the hallway for evidence. Officer Jack Doolittle found eight expended .22 caliber casings in the hallway and near Gil's body, and two deformed bullet slugs under his body. He also observed two strike marks, one in the wall near the doorway to apartment 302 and the other closer to the fire escape, that appeared to have been made by bullets fired from the direction of the staircase. The strike marks appeared to be recent, but Doolittle had no way of knowing when they were made. Doolittle found a wallet in Gil's pocket containing $342.

Espinoza and Doolittle were both at the scene for about four and a half to five hours. Four African-American youths in their late teens attracted their attention because they "continually" came up and down the stairs, going in and out of unit 315, "trying to get as close to the scene as possible; never asking any questions but seemed to be very interested in what was going on." Espinoza testified that of the group, Mouton appeared the most interested. Doolittle had a gunshot residue test kit available, but did not test any of the four; he testified that the test would be worthless if the suspect's hands had been washed.

Espinoza spoke with the four in the lobby and they identified themselves as Eric Greene, Curtis Lofton, Randy Mouton and Nakeyveyon Jones. Greene provided identification showing his name and address in San Leandro, and gave his birthdate as May 11, 1975. He was wearing a blue shirt and black jeans and was 5'10" and 140 pounds. The other three did not provide identification. Lofton gave his address as 1900 26th Avenue, unit 102, and his date of birth as August 5, 1976. He was wearing a dark blue jacket, red plaid shirt and black pants and was about 5'10" and 155 pounds. Mouton also gave unit 102 as his address, and gave a birth date of December 19, 1979. He was wearing a blue and gray cap, black leather jacket, blue shirt, black jeans, and appeared to be about 5'4" and 120 pounds. Nakeyveyon Jones gave his address as 2107 89th Avenue. He was wearing a blue multi-colored shirt and light blue jeans. In response to Espinoza's question, all four denied knowing anything about the shooting, although one said something about having heard gunshots.

Doolittle testified that the apartment building had one main door and two fire escapes. One fire escape led to the sidewalk, with a folding ladder that could be released for descent to the sidewalk; the other led to the courtyard. The fire escapes had unrestricted access to the building. The apartment manager testified that the courtyard was surrounded by a 10-foot fence, with a gate leading to 26th Avenue that was supposed to be kept locked. Police officer Bernard Thurman, who was also investigating the scene just after the shooting, testified that the ladder on the fire escape to the courtyard was not extended.

The manager of the apartment building testified that in January 1996, 22 of the 41 units in the building were occupied. Transito Chavez lived in unit 110 on the first

floor.  Three African-American males between the ages of 15 and 25 years lived in the building, one, a "heavyset guy" about 250 to 300 pounds, in unit 111, and two in unit 102.  The manager often saw the taller of these two in apartment 212, which was rented to Maria Watson.

Police officers who canvassed the building shortly after 11:30 p.m. on January 20 were able to contact people in 11 of the 38 apartments.  These included Maria Watson, an approximately 20-year-old African-American in apartment 212, Dorothea Smith - Mouton's mother - an approximately 40-year-old African-American in apartment 102, and an African-American in apartment 314 who gave his name as Antoine Lofton and his birthdate as August 5, 1976.  At trial, co-defendant [Curtis] Carroll's uncle testified that Carroll's father's name was Curtis Lofton and that Curtis Carroll's birthday was August 5, 1978.  One of the officers, Bernard Thurman, noticed two or three young men going back and forth from the exterior of the building to apartment 102; at one point, one of the young men came from the direction of apartment 102 and put a bag into a dumpster.  Thurman's subsequent search of the premises included the insides of the dumpsters.

Shawnique Peterson testified that on January 20, 1996, she was living in apartment 314 at 1900 26th Avenue with her two children.  She had been "going out" with appellant Greene for about a year; he stayed with her two or three times a week and with his mother in San Leandro the rest of the time.  Greene, Mouton and Carroll were close friends and spent "a lot" of time together.  Carroll did not live at the building but Peterson saw him there every day.  Mouton lived on the first floor of the building with his mother, Dorothea Smith.

Peterson had been in Mouton's apartment often and on one occasion before January 20 had seen two guns, one that looked like a rifle and one a "long gun" that looked like an "Army gun" or "machine gun."  The latter had a "Banana Clip" that held "a lot" of bullets.  The rifle was kept under a mattress and the other gun was kept wrapped in a sheet in a closet.  The day Peterson saw the guns, she was in the apartment with the three appellants and Mouton and Carroll took the guns out.  On December 31, 1995, Peterson was in her apartment with the three appellants and the three talked about celebrating New Year's by going to the roof of the building and shooting "the gun."[3]

On January 20, 1996, Peterson left the building around 5 or 6 p.m. to go to her mother's house.  Before leaving, she went to Mouton's apartment and gave Greene a kiss goodbye.  The three appellants were there, as well as a 14 or 15 year old with a "funny name" whom Peterson had not seen before.  This teenager's name "might"

---

[3]  Maria Munoz testified that on the afternoon of New Year's Day in 1996 she heard a shot and then saw a "black" young man in the doorway to the courtyard of the building shoot a rifle three or four times.  She subsequently picked Mouton's photograph from a line-up and at trial identified Mouton as the shooter.

1    have been Nakeyveyon.

2    Over the course of the evening, Peterson and Greene paged each other about every
3    half hour, five or six times each. Greene's pages left Peterson's phone number except
     for the last page before Peterson returned to the building, which left Mouton's phone
4    number. Peterson returned to the building at about 9:30 or 10 p.m. and saw police
     officers but not paramedics. Appellants and the teenager were in Peterson's
5    apartment and remained there for about an hour, until Peterson got ready to go to bed.
6    At that point, Mouton, Carroll and the teen-ager left and Greene stayed.

7    Peterson learned the next day that Greene had been arrested. Sometime after that, she
     was interviewed by the police at her house. The day following the interview,
8    Mouton's brother Omar called her over to an apartment across the street, saying
     Carroll wanted to talk to her. Mouton had already been arrested by this time. Omar
9    asked Peterson, "'what they say about "E,"'" and Peterson believed he was asking
10   about Greene. She replied that "they was trying to pin him down for murder" and that
     this "wasn't right because he didn't do that." Peterson asked Carroll what had
11   happened and Carroll said that he had shot the "Mexican guy." Peterson asked where
     the gun was and Carroll said he had it and was going to destroy or sell it and leave
12   town.

13   Peterson acknowledged that when she first talked to the police she told them Greene
14   was alone in her apartment when she returned on the night of January 20 and that this
     was not true. Her relationship with Greene continued for about a year after this
15   incident and she testified that she "really like[d] him." She testified that she liked
16   Carroll, too, and did not get angry with him.

17   Peterson testified that at the time of the shooting Mouton was about 16 years old,
     Carroll was about the same age or older, Green was a few years older, and the teen-
18   ager appeared to be a year or two younger than Mouton and Carroll. Peterson had
     never seen Greene hold a gun. Peterson acknowledged she was on probation for a
19   misdemeanor battery which occurred on February 26, 1997.

20   Dorothea Smith, Mouton's mother, testified that Mouton and Carroll had been close
21   friends throughout their lives. On January 20, 1996, she lived in her apartment with
     her fiancé and Mouton; the apartment had one bedroom and Mouton sometimes slept
22   there and sometimes slept on the couch. Omar Smith sometimes stayed with her but
23   often stayed with girlfriends. On March 20, 1996, police officers searched the
     apartment and found a rifle under the couch. She had never seen the rifle before and
24   had never seen ammunition in the house or in Mouton's possession. On the evening
     of January 20, she was in her apartment when she heard the shooting and Mouton
25   was there was well. Asked whether she had told the police on March 20 that she and
26   Mouton were not at the apartment building when the shooting took place, she
     testified that she did not remember what she had told them and said, "I probably was
27   drinking."

28   On March 20, 1996, Detective Thomas Swisher conducted a search of the apartment

where Dorothea Smith and Mouton lived. Smith pointed to a couch in the front room as being where Mouton slept and to a closet where he kept his clothes. The police found a .22 rifle wedged between the springs and cushions of the couch, a shotgun shell on the floor behind the couch, and a bag under the couch containing a liquor box and a long sock that each contained .22 caliber ammunition. The liquor box held a 100-count box of "CCI .22 long rifle hallow point mini mag rounds," missing 15 or 16 rounds; the sock held five smaller boxes of "Thunderbolt brand .22 caliber ammunition. The police also found "CCI mini mag" .22 caliber rounds under the mattress in the bedroom, with some 83 missing from the 100-count container. In the closet, the police found seven 12-gauge shotgun shells. A .22 caliber casing was found on the floor in the front room. Dorothea Smith denied having any knowledge of weapons or ammunition in her home. In an interview about six hours after the search, Smith told Swisher that she, her boyfriend and Mouton had been out visiting her daughter on the evening of January 20, 1996, and that the shooting had already occurred by the time they returned to the building.

Lansing Lee, a criminalist with the Oakland Police Department, testified that the eight casings recovered from the homicide scene were .22 caliber, either "long" or "long rifle," manufactured by CCI. All eight were fired from the same firearm, which was not the rifle found in Mouton's apartment. The 12 casings recovered from the roof of the building were also CCI long or long rifle .22 caliber. Three of these 12 casings were fired from the same firearm that fired the ones at the homicide scene; six were fired by the firearm found in Mouton's apartment; and three were fired by a third firearm.

Mouton was arrested on March 20, 1996; Greene was arrested on March 21, 1996, and Carroll was arrested on April 9, 1996.

Criminalist Jennifer Hannaford testified that a fingerprint on the liquor box found in Mouton's apartment belonged to Carroll. A fingerprint on the underside of the lid of the cartridge box found in Mouton's apartment belonged to Mouton.

Swisher interviewed Nakeyveyon Jones on March 18, 1996, as a witness, because Jones had been seen leaving the building just before the shooting. Jones first denied knowing anything about the shooting and said he had never been at an apartment house at 26th and Foothill. After Swisher showed him a witness sheet from the crime report that listed his name and a photo lineup containing his photograph, Jones "remembered being at the scene the night of the shooting." Jones said he had been with appellants before the shooting and had left the building because he "didn't want any part of the robbery that had been planned." He said he had seen two Hispanics come into the building as he left. After the shots were fired, Mouton's mother let Jones back into the building and told him to go to the second floor, where the other young people were. He went back inside the building, after the shots were fired. Swisher characterized the interview of Jones as "low- keyed," with no yelling and no threats. Nakeyveyon Jones was not available to testify at trial and his preliminary hearing testimony was read into the record over appellants' objections. Jones testified that on the evening of January 20, 1996, he left his house with his friend Chris,

Carroll, Omar Smith and "some females" in Chris' car. Chris drove to the store and the girls got out and bought some chips. The group then continued to Mouton's mother's apartment, where Mouton's mother let them in; Mouton was there.

At another point in his testimony, Jones said that Mouton had been with him, Carroll, and the girls when they first came to the building. Jones testified that on the way into the building, some boys had given them some trouble and one had said he was going to shoot Jones. He testified that he went to get Mouton, who came out with a rifle and then returned inside.

After about 10 minutes, Chris and Omar left. Jones wanted to leave but Omar told him to stay. Jones saw Mouton jump on top of the refrigerator and pull two rifles from behind it, look at them and put them back. Carroll and Mouton talked about having shot the gun "on New Year's."

Jones initially testified that he, Mouton and Carroll went upstairs to Greene's apartment and watched television for about 10 minutes, then Jones and Carroll returned to Mouton's apartment and continued talking with the girls, after which Greene and Mouton came back to the apartment and the girls left to go to the club "Faces." At another point in his testimony, Jones stated that he remained downstairs while the girls were there and did not go upstairs with the others until after the girls left. After the girls left, Jones and the three appellants went back to Greene's apartment and Mouton suggested going to a club called "Faces."[4] Carroll suggested they rob someone and Mouton and Greene agreed; Jones did not want to and appellants called him names. Mouton got a gun which he and Carroll told Jones was not loaded: Jones testified first that the group went back to Mouton's apartment and Mouton came out with a rifle that he "pointed around," then later testified that he remained upstairs in Greene's apartment when Mouton went downstairs and got the gun. Appellants put on masks made from tee shirts. Jones wanted to go home. He testified initially that Carroll told him not to leave because "we had got into it with some boys downstairs," and later that he was scared to go outside because there were "some boys I had problems with down there that said they was going to shoot me."

In any event, Jones left. He testified at one point that when he left Mouton was holding the gun and at another point that when he left Mouton had handed the gun to Carroll. As Jones left the apartment building, he saw two Mexican men entering. Jones went to the corner, looking for a bus to go home, but there was not one coming. A minute after seeing the men enter the building, he heard gunshots and ran back inside. He went to Mouton's apartment and knocked but there was no answer, so he went upstairs to a girl's apartment he had previously been to with Carroll. An "old lady" opened the door and Jones saw appellants and a girl there. Appellants were breathing fast and talking about the robbery. Carroll was rummaging through "the wallet." Jones saw a piece of paper with Spanish words on it fall from the wallet. Jones saw someone put the gun under the bed and appellants told Jones, "don't say

---

[4] Jones had not met Greene before this evening.

nothing." Jones was scared and called his mother and father to pick him up but neither was able to. Someone knocked on the door and Greene told Jones not to answer it and went into a closet. Jones testified that Greene's girlfriend came into the apartment after the shooting, although he indicated this occurred in Greene's apartment.

Later, Mouton went downstairs, followed by Jones and Carroll and then Greene. They were stopped by the police, who asked for their names. Carroll gave a fake name. Appellants went to the store, then returned to the building; Mouton and Greene went inside and Jones and Carroll left. On the way home, Carroll told Jones not to tell anyone anything and Jones was scared, thinking "probably he was going to shoot me." Subsequently, Jones saw Carroll when Carroll came to see Jones' cousin and Carroll told Jones, "I never thought I could pull a trigger like that."

Jones acknowledged that he had been arrested for driving a stolen car with a gun in it, and that he was on probation. He had also been found in possession of cocaine, although he claimed some other boys had "put it on [him]." Jones testified that when he was interviewed by the police a couple months after the shooting, he first lied because he was scared, then told the truth. Appellants did not testify.

Appellants were charged by an amended information filed on January 17, 1997, with the murder of Gilberto Medina Gil (Cal. Pen. Code § 187); attempted murder of Enrique Rodriguez (Cal. Penal Code §§ 187, 664); robbery of Enrique Rodriguez (Cal. Penal Code § 211) and attempted robbery of Gilberto Medina Gil (Cal. Penal Code §§ 211, 664). It was alleged that Carroll personally used a rifle (Cal. Penal Code §§ 1203.06, 12022.5) and that Greene and Mouton were armed with a rifle (Cal. Penal Code § 12022(d)) in the commission of the first three charged offenses; that Carroll personally inflicted great bodily injury (Cal. Penal Code § 1203.075) in the commission of the murder; and that Greene previously had been convicted of felony possession of narcotics. The prosecution subsequently dismissed the fourth count (attempted robbery) and the great bodily injury enhancement.

Jury trial was originally set for November 16, 1998, and, after continuances, began on March 29. 1999. On May 12, 1999, the jury found appellants guilty of first degree murder, attempted murder and first degree robbery. The jury found true the allegations that Carroll personally used a rifle in the commission of the offenses and found not true the allegations that Greene and Mouton were armed with a rifle during the commission of the offenses. Greene filed a motion for a new trial on June 29, 1999, in which Carroll joined on July 9; Mouton filed a motion for a new trial on July 12. These motions were denied on November 12, 1999.

On March 7, 2000, Mouton and Greene were each sentenced to a prison term of twenty-five years to life on count one, with concurrent upper terms of nine years on count two and six years on count three.

Respondent's Exh. C (Unpublished Opinion of the California Court of Appeal, First Appellate

1  District, People v. Mouton, A090842, Jan. 31, 2002) at 2-13.

2                                **DISCUSSION**

3  **A. Standard of Review**

4
5          This Court will entertain a petition for writ of habeas corpus "in behalf of a person in

6  custody pursuant to the judgment of a State court only on the ground that he is in custody in

7  violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  The

8  court may not grant a petition with respect to any claim that was adjudicated on the merits in

9  state court unless the state court's adjudication of the claim: "resulted in a decision that was

10
11 contrary to, or involved an unreasonable application of, clearly established Federal law, as

12 determined by the Supreme Court of the United States[.]" 28 U.S.C. § 2254(d)(1).

13         "Under the 'contrary to' clause, a federal court may grant the writ if the state court arrives

14 at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the

15 state court decides a case differently than [the] Court has on a set of materially indistinguishable

16 facts." Williams v. Taylor, 529 U.S. 362, 407 (2000).  "Under the 'reasonable application

17 clause,' a federal habeas court may grant the writ if the state court identifies the correct governing

18 legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of

19 the prisoner's case." Id.  "[A] federal habeas court may not issue the writ simply because the

20 court concludes in its independent judgment that the relevant state court decision applied clearly

21 established federal law erroneously or incorrectly.  Rather, that application must also be

22
23 unreasonable." Id. at 411.

24         A federal court making the "unreasonable application" inquiry in a habeas case should ask

25 whether the state court's application of clearly established federal law was "objectively

26
27 unreasonable." Id. at 409.  The "objectively unreasonable" standard does not equate to "clear

28 error" because "[t]hese two standards . . . are not the same.  The gloss of clear error fails to give

proper deference to state courts by conflating error (even clear error) with unreasonableness."

Lockyer v. Andrade, 123 S. Ct. 1166, 1175 (2003) (citation omitted). This standard of review,

however, does not relieve a federal court of review from its duty to examine and analyze the state

court's application of federal law.

A federal habeas court may grant the writ it if concludes that the state court's adjudication

of the claim "resulted in a decision that was based on an unreasonable determination of the facts

in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The

court must presume correct any determination of a factual issue made by a state court unless the

petitioner rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C.

§2254(e)(1).

**B. Petitioner's Claims**

(1) Wheeler/Batson Claims

Petitioner alleges that the trial court committed reversible error when it denied defense

motions for a mistrial pursuant to Batson v. Kentucky, 476 U.S. 79 (1986) and People v.

Wheeler, 22 Cal.3d 258 (1978). Respondent's Ex. D (Petitioner's Pet. for Review) at 3. At trial,

the prosecution exercised a total of seventeen[5] peremptory challenges, eight of which were

directed toward African-Americans.[6] Ex. C at 14. Petitioner claims that seven of these

peremptory challenges were made improperly on the basis of race.[7] Id.

---

[5] The prosecutor at trial claimed he had exercised eighteen challenges; the record reflects seventeen.

[6] The prospective jurors excused were James B., Vera P., Abubakar B., Deborah N., Getahun B., Shirley G., Carey M., Melba B., Jose Y., Cynthia I., John. J., Syreeta D., Claire N., Charles B., Cassandra V., and Artena P. Although the appellate court states seventeen jurors were excused, the decision only lists the names of the above sixteen jurors.

[7] Petitioner asserts that the prosecutor used sham excuses to remove *eight* African-American jurors. Ex. D at 4 (emphasis added). However, the appellate decision held that

1  The final jury composition included two African-Americans. Id.

2          Throughout jury selection, Petitioner moved for a mistrial several times, both by making

3  a Wheeler motion and by arguing that the prosecutor was exercising peremptory challenges based

4  on race.[8]  Ex. C at 14. While it found that Petitioner failed to establish a prima facie case under

5  Wheeler[9] because two African-Americans remained on the jury, the trial court required the

6  prosecutor to explain his reasons for excusing the prospective African-American jurors. Ex. C at

7

8  15.

9          A criminal defendant has a constitutional right stemming from the Sixth Amendment to a

10  fair and impartial jury pool composed of a cross section of the community. See Holland v.

11  Illinois, 493 U.S. 474, 476 (1990); Taylor v. Louisiana, 419 U.S. 522, 538 (1975); Duncan v.

12

13  Louisiana, 391 U.S. 145, 148-58 (1968). The Sixth Amendment's fair cross section requirement

14

---

Petitioner did not "challenge the removal of one of the eight African-American Jurors, Syreeta D. At trial, [Petitioner] tried unsuccessfully to have Syreeta D. removed for cause, arguing that she did not have 'a grasp of what's going on.' The prosecutor excused her because she was 'not very bright' and the prosecutor was concerned about her ability to understand the case . . ." Ex. C at 14. Accordingly, for purposes of the present analysis, Syreeta D's removal will not be discussed.

[8]  After the prosecutor's sixth peremptory challenge, Petitioner moved for a mistrial under Wheeler claiming three of the prospective jurors were excused because they were African-American. Ex. C at 14. The court denied the motion. The Wheeler motion was made again after the ninth, thirteenth, fifteenth and seventeenth peremptory challenges. Ex. C at 15.

[9]  The United States Supreme Court held in Johnson v. California, 125 S. Ct. 2410 (2005), that the proper standard for judging whether a prima facie case had arisen was the Batson "inference" standard, not the California Wheeler state standard of "more likely than not." Johnson, 125 S. Ct. at 2416. However, a federal habeas court need not dwell on the first step of the Batson analysis if the matter has proceeded to the second or third step. "Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant has made a prima facie showing becomes moot." Hernandez v. New York, 500 U.S. 352, 359 (1991); cf. Stubbs v. Gomez, 189 F.3d 1099, 1104 (9th Cir. 1999) (appellate court would not consider whether a prima facie showing had been made; question was mooted by habeas evidentiary hearing at which prosecutor first explained his peremptory challenges and district court found them to be race-neutral).

does not prevent either side from exercising its peremptory challenges in order to exclude

cognizable groups from a jury that is impaneled.  The Sixth Amendment requires only an

impartial, not a representative, jury.  See Holland, 493 U.S. at 476-80.  There is no violation of

the Sixth Amendment right to a jury composed of a fair cross section of the community, for

example, when a prosecutor uses his peremptory challenges to exclude blacks.  See Batson, 476

U.S. at 84 n.4;  Weathersby v. Morris, 708 F.2d 1493, 1497 (9th Cir. 1983), cert. denied, 464

U.S. 1046 (1984).

Wheeler motions are made in California state courts in response to a pattern of

peremptory challenges being used to strike potential jurors on the basis of race.  Wheeler, 22 Cal.

3d. at 276-77.  Batson, the federal counterpart of California's Wheeler decision, provides similar

protections against group bias in the exercise of peremptory challenges.  Batson, 476 U.S. at

85-86.  African-Americans are a cognizable group under both Wheeler and Batson.  People v.

Catlin, 26 Cal. 4th 81, 116 (2001).  In order to prevail on a Wheeler/Batson motion, a party must

"raise a timely objection and make a prima facie showing that one or more jurors has been

excluded on the basis of group or racial identity."  People v. Jenkins, 22 Cal. 4th 900, 915

(2000).  Batson holds that the moving party must "raise an inference" that a juror was excluded

on an impermissible basis in order to make out this prima facie case.  If such a prima facie case is

made, the burden shifts to the non-moving party to demonstrate genuine nondiscriminatory

reasons for the challenge or challenges.  Jenkins, 22 Cal. 4th at 915.  While challenges based on

group bias are forbidden, "passivity, inattentiveness, or inability to relate to other jurors... [are]

valid, race-neutral explanations for excluding jurors."  United States v. Changco, 1 F.3d 837, 840

(9th Cir. 1993) (citations omitted).  Additionally, challenges based on attorney distrust of a

juror's responses on a juror questionnaire or to direct question have been upheld as legitimate.

See Stubbs, 189 F.3d at 1105-07.

On appeal, <u>Wheeler</u> motions are reviewed "'with great restraint' [Citation.]," as the trial judge's determination is "a factual one, and as long as the trial court makes a 'sincere and reasoned effort' to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal when they are supported by substantial evidence." <u>People v. Ervin</u>, 22 Cal.4th 48, 75-76 (2000).  The findings of the state appellate court will only be disturbed on habeas review if they are "contrary to, or an involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "[were] based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).

Respondent contends that the prosecutor exercised the peremptory challenges in good faith by setting out race neutral reasons for the seven peremptory challenges at issue and that none of the challenges were applied inconsistently to minority and non-minority jurors.  Resp. Mem. at 23.  Petitioner argues that the "trial court erred in uncritically accepting the prosecutor's reasons for his challenges to African-American jurors, as those reasons were implausible in light of the entire record of voir dire."  Ex. D at 3.  The state appellate court reviewed the prosecutor's reasons for excusing the seven jurors and found that the prosecutor stated plausible, non-discriminatory race-neutral reasons for striking the jurors in question.  Ex. C at 27.

### A. Vera P.

The prosecution excused Vera P. because she had "admitted that she [had] been convicted of a moral turpitude crime . . . [of] credit card fraud.  She was in possession of a stolen credit card."  Ex. C at 18.  The prosecution believed that Vera P.'s conviction of a crime of moral turpitude rendered her unsuitable as a juror in a criminal case.  Additionally, the appellate court noted that Petitioner did not argue Vera P.'s prior conviction was an invalid reason for the prosecution's peremptory challenge.  Instead, Petitioner attacked the prosecutor's sincerity by

1    noting two Caucasian jurors were not challenged even though they had been arrested in the past.

2    Ex. C. at 19.

3    The appellate court rejected Petitioner's argument, stating:

4
5            The California Supreme Court has repeatedly rejected 'a procedure that places an
             'undue emphasis on comparisons of the stated reasons for the challenged excusals
6            with similar characteristics of nonmembers of the group who were not challenged
             by the prosecutor, 'noting that such a comparison is one-sided and that it is not
7            realistic to expect a trial judge to make such detailed comparisons midtrial.'
             (People v. Turner, supra, 8 Cal.4th at p. 169, quoting People v. Johnson, 47
8            Cal.3d 1194, 1220-21 (1989).(citations omitted) . . . . Here, the comparison
             between Vera P.'s conviction of an offense related to use of a stolen credit card
9            and the prior arrests of Trial Jurors Nos. 7 and 8 simply does not work.  Whatever
             the explanation Vera P. offered, she pled no contest to an offense involving moral
10           turpitude.  Juror No. 7 had never been convicted of any offense but had been
             falsely arrested as a teenager . . . .Similarly, Trial Juror No. 8, an epileptic, had
11           been arrested in the 1960's because the police thought he/she was drunk and
             disorderly . . [the prosecution believed] nothing in [their] experience might affect
12           his/her ability to be fair and impartial.
13

14
15   Ex. C at 20.

16           The appellate court therefore concluded that the prosecutor stated plausible, non-

17   discriminatory reasons for excusing Vera P.

18           **B. Abubakar B.**

19           The prosecution excused Abubakar B. for several reasons.  The first reason was that

20
21   Abubakar B. was a social director of an after school program for underprivileged children, a fact

22   which the prosecutor believed might cause him to "have a more forgiving attitude towards these

23   three defendants because the very nature he does work for, folks come from a similar background

24   as these three defendants." Ex. C at 21.  Petitioner argues that the prosecutor's above comment

25   reflects an improper reason for the peremptory challenge.  However, the state appellate court

26   found the prosecutor's belief that Abubakar B. might be more sympathetic towards Petitioner

27   because of his occupation was racially neutral.  The court noted that just because Abubakar B.

28

"stated he would not be influenced by sympathy based on [Petitioner's] age did not preclude the prosecutor from drawing a different inference." Ex. C at 21.

Second, the prosecutor excused Abubakar B. because he was one of the jurors who laughed sarcastically when asked if he would believe the police officers' testimony and also because he failed to answer six questions on the juror questionnaire including "innocuous questions, about, for example, his kids and things of that nature." Ex. C at 21. Challenges based on attorney distrust of a juror's responses on a juror questionnaire or to direct question have been upheld as legitimate and race-neutral. Stubbs, 189 F.3d at 1105-07. The appellate court therefore concluded that Petitioner's claim as to Abubakar B. was without merit. Ex. C at 22.

### C. Getahun B.

Getahun B. indicated that Petitioner's age might affect his ability to reach a guilty verdict even if he believed Petitioner was guilty beyond a reasonable doubt. Petitioner contends this was an insufficient basis for the prosecutor's peremptory challenge of Getahun B., because Getahun B. "ultimately stated he would follow the law" despite the difficulty he might experience doing so because of Petitioner's age. Ex. C at 22.

The prosecutor stated adequate reasons for excusing Getahun B. "He [Getahun B.] was not sure whether he could [find Petitioner guilty due to his age] . . . I can't take that chance. I need someone who is going to say adamantly that is not an issue." Ex. C at 22. The appellate court concluded that the prosecutor's explanation was satisfactory and that the record provided no basis for Petitioner's argument that the exclusion of Getahun B was based on race.

### D. Shirley G.

The prosecutor excused Shirley G. because her responses about her past experiences with the police, including having been falsely arrested and having witnessed a friend being beaten by

police officers, suggested a "degree of anger and hostility." Ex. C at 23.  Petitioner contends that

although Shirley G. "readily admitted" her negative experiences with police officers, she did not

"express present hostility towards the police or unwillingness to follow the law." Ex. C at 23.

Additionally, Petitioner argues the prosecutor's challenge was inconsistent because Trial Juror

No. 7 and No. 8 were not excused despite their past false arrests and negative experiences with

the police.  Ex. C at 23.

The state appellate court determined that the prosecutor's reason for excusing Shirley G.

was "inherently plausible and supported by the record." Ex. C at 24 (citing to <u>People v. Silva</u>, 25

Cal.4th 345, 385-86 (2001)).  It noted that the prosecutor also had excused James B., a Caucasian

prospective juror who had a past negative experience with police officers and the prosecutor had

not challenged Trial Jurors No. 7 and No. 8 because both had affirmatively stated their prior

arrest experiences did not cause them to harbor any ill will towards the police and because they

believed they could be fair and impartial jurors.  Ex. C at 23.

### E. Melba B.

The prosecutor excused Melba B. for two reasons.  First, Melba B. was eighty years old

and had arthritis which she indicated in her questionnaire "might physically cause her to be

unable to sit as a juror." Ex. C at 24.  The prosecutor felt that Melba B.'s arthritis "might cause

inconvenience and might interfere with the juror's concentration." Ex. C at 25.  Petitioner claims

that the prosecutor's concern that Melba B's arthritis would inhibit her from walking up and down

the courthouse stairs was irrelevant because the courthouse had elevators and because this did not

impact her ability to perform as a "fair, impartial juror." Ex. C at 24.  The appellate court

rejected Petitioner's argument stating "A concern that a juror might be uncomfortable, be caused

inconvenience or cause inconvenience to others in a lengthy trial is a race-neutral reason for

exercising a peremptory challenge and [the] trial court was entitled to accept it as genuine." Ex. C at 25.

Second, the prosecutor asserted that ex-school teachers, like Melba B., tend to be liberal and "forgiving of children" a reason supported by California case law. Ex. C at 24; See People v. Barber, 200 Cal.App. 3d 378, 394. Petitioner alleges that the prosecutor was inconsistent because he did not challenge Trial Juror No. 3. a school teacher, thus raising, as the appellate court acknowledged "some question as to the legitimacy of the prosecutor's explanation in this case." Ex. C at 25. However, the appellate court deferred to the trial court's finding that the prosecutor stated race-neutral reasons for excusing Melba B. noting the record on appeal "does not reflect what level of education Melba B. taught, or for how long, making it difficult to compare the likelihood of her being sympathetic toward [Petitioner] against the likelihood of such sympathy from Juror No. 3, who had only recently begun to work as a teacher's assistant with preschool-age children." Id.

### F. Charles B.

The prosecutor excused Charles B. because he believed Charles B. was "a little bit off, a little bit weird" because when the clerk called his name "he approached and said 'that's Charles [B.] Senior, in kind of a cavalier way. Not Charles [B.] Junior.'" Ex. C at 25. The prosecutor felt that Charles B.'s apparent attitude could cause conflict with the other jurors. Id. Additionally, the prosecutor was "'greatly' concerned with Charles B.'s comment that his daughter had been 'falsely accused of driving while Black' and that this 'happens frequently in society,' which 'implied a bias against police.'" Ex. C at 26. The prosecutor noted that Charles B. had worked with the food stamp program which suggested a "more forgiving attitude of someone who might have been in a social or impoverished state." Ex. C at 26. Although the prosecutor

acknowledged that Charles B. admitted he could be impartial, the prosecutor did not want to "take any chances." Ex. C at 25.

Petitioner contends Charles B. was not "weird," because his comment that he was "Charles [B.] senior" not "junior" stemmed from the fact that Charles B. Junior, his son, was sitting as a juror in one of the other courtrooms the same day. Ex. C at 26. Petitioner also argued Charles B.'s prior experience as a juror and the fact his son had been a robbery victim made him a good choice. Id. The appellate court rejected Petitioner's arguments:

> "the prosecutor was entitled to act on his feeling [that Charles B. was weird] as long as it was not based on Charles B.'s race. Moreover, this was not the only reason the prosecutor offered for excusing Charles B. As indicated above, the prosecutor's impression that a person whose occupation involved the provision of social services might tend to be sympathetic to defendants from an impoverished background constitutes a race-neutral reason for a peremptory challenge. [People v. Trevino, 55 Cal. App. 4th 396, 411-12.] Moreover, although Charles B. stated he would judge the police officers' credibility the 'same way' as anyone else's he acknowledged [some skepticism in his ability to do so] . . ."

Ex. C at 26.

### G. Artena P.

The prosecutor excused Artena P. for two reasons. First, she had cerebral palsy, the physical symptoms of which concerned the prosecutor because of the possible "distractions caused by physical issues, as well inconvenience to everyone if Artena P. could not climb stairs and the possibility of having to reconstitute the jury of Artena P. had to be excused during trial." Ex. C at 27. Additionally, the prosecutor expressed a desire for a juror who showed no indication of wavering in her decision or who was induced to "sympathize with the defendants due to their age." Id. Finally, the prosecutor believed Artena P. seemed too "timid and very soft spoken." Id. Petitioner contends that the prosecutor's reason for excusing Artena P. because his belief she lacked "decision-making and managerial skills" was inconsistent with excusing both

1   Abubakar B. and Charles B., who appeared to possess such skills.  Ex. C at 27.

2        The state appellate court found that the prosecutor's concern regarding Artena P.'s

3   physical inability to sit for the trial was race-neutral and that the prosecutor stated "other valid

4

5   reasons for excusing Abubakar V. and Charles B. which were accepted by the trial court."  Ex. C

6   at 27.  Indeed, while challenges based on group bias are forbidden, "passivity, inattentiveness, or

7   inability to relate to other jurors... [are] valid, race-neutral explanations for excluding jurors."

8   See Changco, 1 F.3d at 840.

9

10        Based on the foregoing reasons, the state appellate court concluded that the trial court

11  properly denied Petitioner's Wheeler/Batson claims because Petitioner failed to prove that the

12  prosecutor's reasons for the peremptory challenges were "either inherently implausible or

13  unsupported by the record."  Ex. C at 27.  The trial court evaluated the prosecutor's proffered

14  reasons in light of  the totality of the circumstances in determining that Petitioner failed to meet

15  his burden of proving purposeful discrimination.  Mitleider v. Hall, 391 F.3d 1039, 1047 (9th

16

17  Cir. 2004);  Lewis v. Lewis, 321 F.3d 824, 831 (9th Cir. 2003), Batson, 476 U.S. at 98;  Wade v.

18  Terhune, 202 F.3d 1190, 1195 (9th Cir. 2000).  The empaneled jury contained two African-

19  Americans.  Although this last fact is not conclusive evidence proving non-discrimination, "it is

20  an indication of good faith in exercising peremptories, and an appropriate factor for the trial

21  judge to consider in ruling on a Wheeler objection. [Citations.] People v. Turner, 8 Cal.4th at

22  168."  Ex. C at 28.

23

24        Petitioner has failed to establish that the state appellate court's decision was contrary to or

25  an unreasonable application of federal law or that it was based on an unreasonable determination

26  of the facts in light of the evidence presented in the state court proceeding.  Accordingly, he is

27  not entitled to relief on this claim.

28

(2) The Trial Court's Admission of The Preliminary Hearing Testimony of a Crucial Unavailable Witness:

***A. Prior Testimony***

Petitioner next alleges that the trial court deprived him of his constitutional rights to confrontation and cross-examination when it determined that Naykeyvon Jones ("Jones"), a crucial prosecution witness, was unavailable and admitted Jones' preliminary hearing testimony into evidence at trial. Ex. D at 5. Petitioner further contends that the prosecution failed to exercise reasonable diligence to ensure Jones' appearance at trial. Ex. D at 5.

The Confrontation Clause of the Sixth Amendment provides that in criminal cases the accused has the right to "be confronted with witnesses against him." U.S. Const. amend. VI. The federal confrontation right applies to the states through the Fourteenth Amendment. See Pointer v. Texas, 380 U.S. 400, 403 (1965). At the time the California Court of Appeal rendered its decision in this case, the governing standard was Ohio v. Roberts, 448 U.S. 56 (1980), which held that out-of-court testimonial statements may be admitted as long as the witness is unavailable and the statements have "adequate indicia of reliability," i.e., fall within a "firmly rooted hearsay exception" or bear "particularized guarantees of trustworthiness." Id. at 66. However, Crawford v. Washington, 541 U.S. 36 (2004), decided after Petitioner filed the instant petition, overruled Roberts. Crawford applies retroactively to collateral attacks. Bockting v. Bayer, 399 F.3d 1010, 1020 (9th Cir. 2005).

The Confrontation Clause applies to all out-of-court testimonial statements offered for the truth of the matter asserted, i.e., "testimonial hearsay." See Crawford, 541 U.S. at 51. "Testimony . . . is typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact." Crawford, 541 U.S. at 51 (citations and quotation marks omitted). The Confrontation Clause applies not only to in-court testimony but also to out-of-

1   court statements introduced at trial, regardless of the admissibility of the statements under state

2   laws of evidence.  Id. at 50-51.  Out-of-court statements by witnesses that are testimonial hearsay

3   are barred under the Confrontation Clause unless (1) the witnesses are unavailable, and (2) the

4   defendant had a prior opportunity to cross-examine the witnesses.  Crawford, 541 U.S. at 59.

5   The reliability of such statements, for Confrontation Clause purposes, depends solely upon these

6

7   two factors.  See id. at 68.

8        While the parties have not addressed this claim based upon the Crawford decision, Ninth

9   Circuit authority requires that this Court consider the issue pursuant to Crawford.  Bockting v.

10  Bayer, 399 F.3d 1010, 1020 (9th Cir. 2005).   Under Crawford, although Jones' prior testimony

11

12  was testimonial hearsay,[10] it was properly admitted pursuant to California Evidence Code § 1291

13  because Jones was unavailable and Petitioner had a prior opportunity to cross-examine Jones at

14  the preliminary hearing.  The admission of Jones' testimony comports with the Supreme Court's

15  decision in Crawford, 541 U.S. at 59, which held that prior testimony may be introduced at trial

16

17  without violating the Confrontation Clause provided that the witness is unavailable and where

18  the defendant had prior opportunity to cross-examine.

19        Petitioner nonetheless argues that his constitutional right to cross-examination was

20  violated by using Jones' preliminary hearing testimony "because although they were able to

21  cross-examine Jones at a preliminary hearing, that hearing involved a lower standard of proof

22

23  and there was a 'presumption' that the witness would be available for trial and subject to the jury's

24  evaluation of his demeanor and credibility."  Ex. C at 37.  The appellate court rejected

25

26      [10]  The Confrontation Clause applies to all testimonial hearsay, which "[w]hatever else
27  the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a
    grand jury, or at a former trial; and to police interrogations."  Crawford, 541 U.S. at 68; see, e.g.,
28  Bockting, 399 F.3d at 1021 (statements made by child-victim in interview with police were
    testimonial hearsay governed by Crawford).

1   Petitioner's argument stating:

2
3
4
5
6
7
8
> This argument would suggest that preliminary hearing testimony can never be
> sufficient under Evidence Code section 1291 [which admits prior testimony if a
> witness is unavailable has given prior testimony subject to cross-examination by
> defendant] . . . While preliminary hearing testimony might not be admissible
> under Evidence Code section 1291 if the defense was precluded from conducting
> a full cross-examination . . [Petitioner] makes no claim that this was the case here.
> Defense counsel - the same counsel not representing [Petitioner] here - cross-
> examined Jones about his prior offenses and statements to the police concerning
> those offenses, about the changes in his story to the police regarding the shooting,
> about his conduct on the night of the shooting and inconsistencies in his account.

9
10   Ex. C at 37.

11       Moreover, on habeas review, this Court can grant relief only if the state court decision

12   was contrary to, or an unreasonable application of, clearly established United States Supreme

13   Court authority.  28 U.S.C. § 2254(d).  The Supreme Court has never held that a prior

14   opportunity to cross-examine must meet any particular standards - for example, that a defendant

15   have the same right and opportunity to cross-examine the witness at a preliminary hearing as at a

16
17   trial - as Petitioner contends here.  Even if Petitioner could establish that his opportunity to cross-

18   examine Jones at the preliminary hearing was not the same as it would have been at trial, there is

19   no "clearly established" Supreme Court authority that would support habeas relief.

20       Petitioner further argues that the admission of Jones' testimony denied him due process

21   because the testimony was "unreliable" Ex. C at 34 and "involuntary."  Ex. C at 37.  The

22   appellate court rejected both of these claims.  First, the appellate court acknowledged that while a

23
24   trial court must exclude witness testimony if a witness is incapable of understanding his duty to

25   tell the truth, it is also the duty of the aggrieved party to make a timely objection to the testimony.

26   Ex. C at 36.  Petitioner failed to make such an objection, and the appellate court found nothing in

27   the record to support Petitioner's claim that Jones' was incapable of understanding his duty to tell

28

the truth.  Although it noted that "the credibility of Jones' statements would be open to great question, given his changes of story, his history of criminal conduct" it also concluded that these observations did not "bear on the fundamental question of his competence to testify."  Ex. C at 36.

The appellate court also rejected Petitioner's claim that Jones' testimony was involuntary because he "completely changed his story during the police interview . . . the change occurr[ing] after a brief break in the police interview during which Jones was accompanied by one officer [Swisher] to get a drink of water."  Ex. C. at 37.  While Petitioner argued that he was denied due process because he did not have an chance to cross-examine Jones regarding the voluntariness of his statement, the appellate court rejected this argument, pointing out that "Jones himself was specifically questioned on this point [the voluntariness of his statement] at the preliminary hearing and testified that Swisher did not say anything [in an effort to coerce a statement from Jones] to him during the water break.  [Petitioner] offer[s] no reason to suspect Jones' testimony would have been any different if he had been available for questioning at the hearing on the voluntariness of his statement."  Ex. C at 38.

Since Jones' prior testimony clearly fits with the "testimonial" exception of <u>Crawford</u> and was properly admitted despite Petitioner's belated arguments, the only remaining question is whether witness Jones was correctly deemed "unavailable" by the trial court.

***B. Witness Unavailability***

Petitioner claims that the prosecution did not "exercise reasonable diligence because it did not begin its efforts to locate Jones until the case was set for trial and failed to take steps to prevent Jones from absenting himself."  Ex. C at 28.  Testimony made during a preliminary hearing may be admitted at trial if the witness is "unavailable."  <u>See</u> <u>Terrovona v. Kincheloe</u>, 852

F.2d 424, 427 (9th Cir. 1988) (dead witness) (citations omitted); Baker v. Morris, 761 F.2d 1396 (9th Cir. 1985) (same). This requires that the prosecutor make a *good faith effort* to obtain the witness's presence. See Barber v. Page, 390 U.S. 719, 724-25 (1968) (emphasis added); United States v. Olafson, 213 F.3d 435, 441-42 (9th Cir. 2000) (good faith effort demonstrated where border patrol agents called witness, who had been inadvertently returned to Mexico, but witness refused to return to testify); Windham v. Merkle, 163 F.3d 1092, 1102 (9th Cir. 1998) (prosecutor made a good-faith effort to locate witness where he subpoenaed witness, met with witness to discuss proposed testimony after issuing subpoena, tried to call witness three times as trial date approached, contacted witness's parole officer, had a bench warrant issued for witness's arrest, and assigned a criminal investigator to locate witness).

Here, the appellate court found that at a hearing on April 14, 1999, the trial court properly determined that the prosecution made reasonable efforts to secure Jones's presence at trial. Ex. C at 30. On three separate occasions, an inspector from the Alameda District Attorney's Office attempted to serve Jones at his mother's house. Ex. C at 30. On February 23, 1999, when Jones's mother told the inspector that Jones was homeless and "might be living out of a large gray American car with grill damage," an all-points-bulletin was issued for Jones the same day. Ex. C at 30. Additionally, the Department of Motor Vehicles was contacted for information about a gray car, and a computerized listing was generated providing contacts throughout Alameda County. Ex. C at 31. The inspector again met with Jones's mother, who the inspector believed was not being totally cooperative, and asked her to contact Jones. She said she would do so but failed to make contact with Jones by the time the inspector spoke with her a week later. Ex. C at 31. On March 22, 1999, an attempt was made to contact Jones's father and a daily bulletin was distributed to the Oakland Police Department and other law enforcement agencies. Ex. C at 31.

On March 23, 1999, the inspector went to Jones's grandmother's house and spoke with Jones's cousin. The cousin indicated she had not seen Jones for a while and did not know where he lived. Ex. C at 31. The inspector again spoke with Jones's mother on March 24, 1999. She had no information regarding Jones's whereabouts. On April 1, 1999, a visit was made to an address believed to be Jones's father although it was discovered he had moved from the address six months before. The inspector then determined Jones was "not in custody in Contra Costa, San Mateo or Santa Clara counties. His regular checks of the computer systems did not reveal any arrests for Jones, and his contacts [the investigator's] with a number of hospitals revealed no patients with Jones's name." Ex. C at 32.

Petitioner maintains that the prosecution was "dilatory in that it made no efforts to secure Jones's appearance at trial between the time of his preliminary hearing testimony on October 16, 1996, and Gadsey's [an Alameda County inspector] unsuccessful attempt to serve him with a subpoena on December 22, 1998." Ex. C at 32. Petitioner contends that the search was not "timely begun." Ex. C at 32 (citing to People v. Cromer, 24 Cal.4th 889, 892 (2001) (a case in which the prosecution lost contact with the witness after the preliminary hearing and did not attempt to find her until months after the first trial date)).

The appellate court rejected this argument noting that "[h]ere, there is no evidence the prosecution had reason to believe it would not be able to find Jones, or Jones would not be a cooperative witness, until it discovered in December 1998 that its information about Jones's address was no longer valid and learned from Jones's mother in January 1999 that Jones did not want to testify." Ex. C at 32. Additionally, the appellate court rejected Petitioner's argument that if "an all points bulletin had been issued sooner, Jones could have been held after the February 5, 1999, disturbance at his mother's house in Hayward . . .[because] the Hayward police would have

1    responded more quickly on February 5 and would have taken Jones into custody." Ex. C at 33.

2    The appellate court found Petitioner's argument to be completely speculative, as there was no

3    evidence that an all-points-bulletin would have made the police respond faster, that Jones would

4    have still been at his mother's house when the police arrived or that arresting Jones on February 5

5    would have ensured his presence at trial two months later.  Although the Penal Code permits

6    material witnesses to be held in custody, such custody is subject to review every ten days, and it

7    was unlikely Jones could have been held for two months. Ex C. at 33.  Based on the record, the

8    appellate court's determination that the prosecution made a "good faith effort" to obtain Jones'

9    presence and that the trial court correctly concluded that Jones was "unavailable" was not

10   unreasonable. See Barber, 390 U.S. at 724-25.

11
12   Because he has failed to establish that the trial court's decision was contrary to, or an

13   unreasonable application of federal law, or that it was based on an unreasonable determination of

14   the facts in light of the evidence presented in the state court proceeding, Petitioner is not entitled

15   to relief on this claim.

16
17        (3) The Trial Court's Refusal to Grant a Mistrial After Prosecution Elicited Expert
             Witness Testimony Regarding Petitioner's Fingerprint Records

18
19        Petitioner next alleges that the trial court's refusal to declare a mistrial after the prosecutor

20   unnecessarily elicited an expert witness's testimony indicating that Petitioner's fingerprints were

21   already in the police department files denied him due process because it led the jury to infer that

22   Petitioner had a criminal record.  Petitioner argues the prejudice from this alleged error was

23   "incurable by any admonition," thereby depriving him of a fair trial. Ex. D at 13.  Respondent

24   contends that the reference to Petitioner's fingerprint exemplars was not unduly prejudicial.

25   Resp. Mem. at 35.

26
27        A person in custody pursuant to the judgment of a state court may obtain a federal writ of

28

1    habeas corpus only on the ground that he is in custody in violation of the Constitution or laws or

2    treaties of the United States.  28 U.S.C. § 2254(a).  A state court's evidentiary ruling thus is not

3    subject to federal habeas review unless the ruling violates federal law, either by infringing upon a

4    specific federal constitutional or statutory provision or by depriving the defendant of the

5    fundamentally fair trial guaranteed by due process.  See Pulley v. Harris, 465 U.S. 37, 41 (1984);

6    

7    Jammal v. Van de Kamp, 926 F.2d 918, 919-20 (9th Cir. 1991) (citations omitted); Middleton v.

8    Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985), cert. denied, 478 U.S. 1021 (1986).

9            Failure to comply with state rules of evidence is neither a necessary nor a sufficient basis

10   for granting federal habeas relief on due process grounds.  See Henry v. Kernan,197 F.3d 1021,

11   1031 (9th Cir. 1999); Jammal, 926 F.2d at 919.  While adherence to state evidentiary rules

12   

13   suggests that the trial was conducted in a procedurally fair manner, it is certainly possible to have

14   a fair trial even when state standards are violated; conversely, state procedural and evidentiary

15   rules may countenance processes that do not comport with fundamental fairness.  See id. (citing

16   

17   Perry v. Rushen, 713 F.2d 1447, 1453 (9th Cir. 1983), cert. denied, 469 U.S. 838 (1984)).  The

18   due process inquiry in federal habeas review is whether the admission of evidence was arbitrary

19   or so prejudicial that it rendered the trial fundamentally unfair.  See Walters v. Maass, 45 F.3d

20   1355, 1357 (9th Cir. 1995); Colley, 784 F.2d at 990.  But note that only if there are no

21   permissible inferences that the jury may draw from the evidence can its admission violate due

22   

23   process.  See Jammal, 926 F.2d at 920.[11]

---

24   [11] See also Rupe v. Wood, 93 F.3d 1434, 1444 (9th Cir. 1996) (evidence of defendant's gun

25   collection did not violate due process where it was brief and non-specific, was embedded in
     longer testimony on other matters, was not emphasized by the prosecutor, was similar to

26   evidence offered by the defendant in mitigation and was accompanied by weighty evidence
     against the defendant), cert. denied, 519 U.S. 1142 (1997); Jammal, 926 F.2d at 919-20

27   (admission of evidence that defendant carried large sums of cash in trunk of car is not type of

28   evidence which necessarily prevents fair trial; jury could draw rational inference that is not
     constitutionally impermissible);  Gordon v. Duran, 895 F.2d 610, 613 (9th Cir. 1990) (admission

At trial, the prosecution presented testimony by Jennifer Hannaford ("Hannaford"), a criminalist at the Oakland Police Department crime lab and expert in fingerprint comparison and identification.  Hannaford testified that she examined fingerprints found on a rifle and boxes of ammunition taken from Petitioner's co-Defendant, Mouton's, apartment.  Although Petitioner's fingerprints were not found on the rifle or boxes of ammunition, when asked by the prosecution how Hannaford obtained fingerprint exemplars to compare Petitioner's fingerprint to, she testified, "We have exemplar prints from the Oakland Police Department and we just took them from the files."  Ex. C at 40.

Petitioner moved for a mistrial, arguing that Hannaford's statement was "extremely prejudicial because it allowed the jury to infer that they [Petitioner and co-Defendants] had prior criminal contacts, probably arrests or convictions."  Ex. C at 41.  Petitioner further argues that Hannaford's statement was so prejudicial, "no cautionary instruction could have cured the harm stemming from the testimony."  Ex. C at 42.

The appellate court concluded that Hannaford's testimony was not incurably prejudicial and upheld the trial court's decision to deny Petitioner's motion for a mistrial.  In doing so, the appellate court first noted that the trial court believed the alleged prejudicial inference of prior arrests could be cured with a cautionary instruction to the jurors.  The trial court suggested an instruction that would have directed the jurors not to be "influenced by any reference which may have been made by a witness regarding any previous contact or record with any police agency which may be been referred to by a - or any witness concerning a defendant, or something like that . . . ."  Ex. C at 41.  However, believing the limiting instruction would highlight Hannaford's testimony, defense counsel declined the proposed instruction be given to the jury.  Subsequently,

of uncharged crimes did not violate due process where trial court gave limiting instruction to jury, jury was able to weigh witness' credibility and evidence was relevant to defendant's intent).

the trial court did not give the limiting instruction and denied the mistrial motion.  Ex. C at 41.

Next, the appellate court addressed Petitioner's argument that Hannaford's testimony was extremely prejudicial, thus warranting a mistrial because it gave rise to the inference that Petitioner had a prior criminal record.  The appellate court held:

> "There can be little doubt that Hannaford's testimony would support an inference that [Petitioner] had criminal records of some sort: It is easy to imagine a juror concluding that since Hannaford obtained the fingerprint exemplars from "police department files," [Petitioner] must have at least been arrested in the past.  As the prosecutor argued at trial, however, this is not the *only* inference a juror could have drawn from the testimony.  At least in the cases of [Petitioner and co-Defendant Mouton], who had been arrested several days before Hannaford undertook her examination of the evidence, a juror could have just as easily have inferred that the fingerprints were in the files because they had been taken at the time of [Petitioner's] arrest.  Hannaford's remark was ambiguous; she did not expressly testify that [Petitioner] had, in fact, been charged with or convicted of crimes in the past."

Ex. C at 41.

Here, the trial court did not abuse its discretion in deciding that the testimony was not incurably prejudicial and did not warrant a mistrial.  Petitioner failed to prove the admission of Hannaford's testimony was so "fundamentally unfair" that it violated his due process rights.  See Walters v. Maass, 45 F.3d at 1357.  Moreover, Petitioner was unable to show that the jury could not draw any permissible inferences from Hannaford's testimony.  See Jammal, 926 F.2d at 920.

Again, Petitioner has failed to establish that the state appellate court's decision was contrary to, or an unreasonable application of federal law, nor that it was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

### (4) The Trial Court's Felony-Murder Jury Instructions

Petitioner next contends that the felony-murder jury instructions given by the trial court deprived him of his "constitutional due process right not to be convicted except on proof beyond

a reasonable doubt of every element of the offense, and his constitutional right to have his jury determine every factual issue in his case." Ex. D at 21.  Citing to People v. Pulido, 15 Cal.4th 713 (1997), Petitioner claims that he could only be found guilty of murder if the jury concluded "that the killing was committed in furtherance of [Petitioner and co-Defendants'] common design, and that the failure to so instruct [the jury] was prejudicial because the evidence would likely have led the jury to conclude the killing did not further the underlying robbery." Ex. C at 48.  In response, Respondent argues that Petitioner misstates the applicable California law, that the jury instructions adequately informed the jury of the above theory and that Petitioner does not assert a direct federal constitutional violation or cite to any Supreme Court cases that would support a due process claim.  Resp. Mem. at 35, 37.  Assuming without deciding that the claim is cognizable on federal habeas corpus grounds, the Court concludes that Petitioner's argument is without merit.

A habeas petitioner is not entitled to relief unless the instructional error "'had substantial and injurious effect or influence in determining the jury's verdict.'"  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)).  In other words, state prisoners seeking federal habeas relief may obtain plenary review of constitutional claims of trial error, but are not entitled to habeas relief unless the error resulted in "actual prejudice."  Id. (citation omitted); see, e.g., Coleman v. Calderon, 210 F.3d 1047, 1051 (9th Cir. 2000) (finding Brecht error where "at the very least" the court could not "'say with fair assurance . . . that the judgment was not substantially swayed by the [instructional] error.'") (citation omitted).  The Brecht standard applies retroactively.  See, e.g., McKinney v. Rees, 993 F.2d 1378, 1385 (9th Cir. 1993) (applying Brecht to pre-Brecht final judgment), cert. denied, 510 U.S. 1020 (1993).

The California Court of Appeal addressed the merits of Petitioner's claim and applied the correct standard.  In doing so, the appellate court first noted that Petitioner was convicted of first degree murder on a felony-murder theory which required that the jury conclude that the killing occurred as a "direct causal result" of a felony.  Ex. C at 48.  The relevant instructions are CALJIC Nos. 8.21, 8.21.1, and 8.27.  Ex. D at 21.  These instructions read as follows:

> The unlawful killing of a human being, whether intentional, unintentional or accidental, which occurs as a *direct causal result of robbery* is murder of the first degree when the perpetrator had the specific intent to commit that crime.

> The specific intent to commit robbery and the commission or attempted commission of such crime must be proved beyond a reasonable doubt.

> For purposes of determining whether an unlawful killing has occurred during the commission or attempted commission of a robbery, the commission of the crime of robbery is not confined to a fixed place or a limited period of time.

> If a human being is killed by any one of several persons engaged in the commission or the attempted commission of the crime of robbery, all persons, who either directly and actively commit the act constituting that crime, or who with the knowledge of the unlawful purpose of the perpetrator of the crime and with the intent or purpose of committing, encouraging, or facilitating the commission of the offense, aid, promote, encourage, or instigate by act or advice its commission, are guilty of murder of the first degree, whether the killing is intentional, unintentional or accidental.

> In order to be guilty of murder, as an aider and abettor to a felony murder, the accused and the killer must have been jointly engaged in the commission of the robbery at the time the fatal wound was inflicted.  However, an aider and abettor may still be responsible for the commission of the underlying robbery based upon other principles of law which will be given to you.

Ex. C at 49.

Petitioner asserts that these instructions permitted the jurors to conclude that the killing occurred as a "direct causal result" of a robbery rather than under the Pulido standard, which permits a "non-killer to be convicted of felony murder only if the killing was committed by his accomplice 'acting in furtherance of their common design.'"  Resp.'s Ex. A (Petitioner's Opening Brief, California Court of Appeal Case No. A090842) at 41.  Petitioner maintains that the

CALJIC felony-murder jury instructions erroneously follow a second line of California cases which state "'a broader rule of felony murder complicity, under which the killing need have no particular causal or logical relationship to the common scheme of robbery; accomplice liability attaches, instead, for any killing committed while the accomplice and killer are jointly engaged in the robbery.'" Id. at 42.

The appellate court reviewed Petitioner's argument and concluded that the trial court appropriately instructed the jury with the CALJIC felony-murder jury instructions. First, the appellate court distinguished Pulido, finding "[t]he criticism discussed in Pulido of the broad rule of felony-murder liability was based on that rule encompassing situations in which one of the accomplices acts impulsively and independently, so that there is no causal relationship between the original plan and the killing." Ex. C at 52.

Next, the appellate court held that liability would attach to Petitioner under either the narrow or broad view of felony-murder accomplice liability:

> The evidence showed that Gil ran up the stairs as he and Rodriguez were accosted by [Petitioner and co-Defendants] at gunpoint; co-Defendant Carroll-who was found by the jury to have been the shooter-immediately followed Gil as the other [co-Defendants] proceeded to rob Rodriguez. The jury was instructed that it could find [Petitioner and co-Defendants] guilty of felony-murder as aiders and abettors only if they and the killer were 'jointly engaged in the commission of the robbery at the time the fatal wound was inflicted.'. . . From the jury's determinations that Carroll was jointly engaged in the commission of the robbery when he shot Gil and that the shooting was a direct causal result of the robbery, it follows that the jury believed Carroll was acting in furtherance of the robbery when he shot Gil."

Ex. C at 51-52.

Although Petitioner contends that the CALJIC jury instructions misstated the essential elements of first degree felony murder, thereby depriving him of his "constitutional due process right not to be convicted except on proof beyond a reasonable doubt of every element of the

1  offense, and his constitutional right to have his jury determine every factual issue in his case,"

2  Petitioner's claim fails to cite to any federal law or cases supporting his claim. Ex. D at 21.

3
4      Moreover, Petitioner has not shown the jury instruction "had substantial and injurious

5  effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637.  As the appellate

6  court pointed out, Petitioner could have been convicted under the narrow or broad standard of

7  felony-murder accomplice liability.  Because this determination was not unreasonable, Petitioner

8  has failed to show that any instructional error resulted in "actual prejudice." Id.

9
10     (5) The Trial Court's Use of CALJIC No. 17.41.1

11     Finally, Petitioner contends that the trial court erroneously instructed the jury with

12  CALJIC No. 17.41.1[12] because that instruction involved the trial court in the jury's deliberative

13  process, thereby depriving Petitioner of his constitutional right to trial by an impartial jury. Ex.

14  D at 25.  Petitioner argues that providing CALJIC No. 17.41.1 to the jury amounts to a structural

15  defect warranting automatic reversal due to the error.  Id.

16
17     Respondent correctly points out that CALJIC 17.41.1 was upheld in People v. Engleman,

18  28 Cal.4th 436 (2002), which held that the instruction "did not violate the defendant's Sixth

19  Amendment right to a jury trial because the right does not require absolute secrecy for jury

20  deliberation 'in the face of an allegation of juror misconduct . . .'" Resp. Mem. at 40-41.

21  Respondent also correctly observes that a challenge to a jury instruction solely as an error under

22
23  state law does not state a claim cognizable in federal habeas corpus proceedings.  See Estelle v.

24  McGuire, 502 U.S. 62, 71-72 (1991).

25

26     [12] CALJIC 17.41.1 provides: "The integrity of a trial requires that jurors, at all times
27  during their deliberations, conduct themselves as required by these instructions.  Accordingly,
    should it occur that any juror refuses to deliberate or expresses and intention to disregard the law
28  or decide the case based on penalty or punishment, or any other improper bases, it is the
    obligation of the other jurors to immediately advise the Court of the situation."

To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.  See Estelle, 502 U.S. at 72; Cupp v. Naughten, 414 U.S. 141, 147 (1973); see also Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974) ("'[I]t must be established not merely that the instruction is undesirable, erroneous or even "universally condemned," but that it violated some [constitutional right].'").

Despite its refusal to undertake an independent analysis of CALJIC No. 17.41.1 while Engleman was pending before the California Supreme Court, the appellate court denied Petitioner's claim concluding that "[i]n the present case, there is no indication CALJIC No. 17.41.1 had any effect on any juror, no indication any juror was refusing to follow the law, intending to decide the case on an improper basis or engaging in other misconduct.  There is no evidence of any prejudice to [Petitioner] from the giving of CALJIC No. 1741.1." Ex. C at 52-53.

Even if instructing the jury with CALJIC No. 17.41.1 was erroneous, Petitioner is not entitled to federal habeas relief because he has not shown that instruction so infected the entire trial that the resulting conviction violates dues process.  See Estelle, 502 U.S. at 72.  There was no reasonable likelihood the jury applied the instruction in a way violating the Constitution.  Id. at 72 & n.4.  There is no evidence the alleged error had a "substantial or injurious effect or influence in determining the jury's verdict" Brecht, 507 U.S. at 637, nor is CALJIC 17.41.1 inconsistent with any Supreme Court precedent.  See Brewer v. Hall , 378 F.3d 952, 955-56 (9th Cir. 2004) (rejecting under AEDPA habeas claims against CALJIC 17.41.1).

\\\

\\\

1

## CONCLUSION

2

The Court concludes that Petitioner has failed to show any violation of his federal

3

constitutional rights in the underlying state criminal proceedings.   Accordingly, the petition is

4

denied.   The Clerk shall enter judgment and close the file.

5

6

IT IS SO ORDERED.

7

DATED: _____

8

JEREMY FOGEL
United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   On ___12 - 19 - 05___, a copy of this order was mailed to the following:

2

3   Eric Greene
    P-75124
4   High Desert State Prison
    P.O. Box 3030
5   Susanville, CA  96127-3030

6

7   David H. Rose
    CA Attorney General's Office
8   455 Golden Gate Avenue
    Suite 11000
9   San Francisco, CA  94102-7004

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28